**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| VELDINA COOK and TORY TUCKER, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>QBE HOLDINGS, INC., BOARD OF DIRECTORS OF QBE HOLDINGS, INC., THE RETIREMENT INVESTMENT COMMITTEE OF QBE HOLDINGS, INC., and JOHN DOES 1-20,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **CIVIL ACTION NO.:** |

**CLASS ACTION COMPLAINT**

Plaintiffs, Veldina Cook and Tory Tucker ("Plaintiffs"), by and through their attorneys, on behalf of the QBE 401(k) Savings Plan (f/k/a QBE The Americas 401(k) Savings Plan)[1] (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I.  INTRODUCTION

1.  This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include QBE Holdings, Inc. ("QBE" or the "Company"), the Board of Directors of QBE Holdings, Inc. (the "Board"), and the Retirement Investment Committee of QBE

---

[1] "The plan was amended to formally change the name to QBE 401(k) Savings Plan effective March 1, 2022 (previously QBE The Americas 401(k) Savings Plan)." Independent Auditor's Report ("Auditor's Report"), attached to 2022 Form 5500 for the Plan, at 7.

[2] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Holdings, Inc. (the "Committee") (collectively, the Company, the Board, and the Committee are referred to as "Defendants").

2. The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Auditor's Report, attached to 2024 Form 5500 for the Plan, at 7 ("The Plan is a defined contribution plan originally effective May 1, 1990. … The Plan is subject to the Employee Retirement Income Security Act of 1974 (ERISA).").

3. To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Halperin v. Richards*, 7 F.4th 534, 546 (7th Cir. 2021).

4. The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "[e]stablish a prudent process for selecting investment options and service providers," including providers of the Plan's administrative and recordkeeping ("RKA") services, and "[m]onitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2[3]; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

---

[3] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited January 13, 2026).

5.      With regard to plan fees, the DOL states "You should know that your employer also must consider the fees and expenses paid by your plan."[4]

6.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

7.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[5]

8.      The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.  *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

9.      Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on

---

[4] *Id*.

[5] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited April 10, 2026) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

3

an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance, and failing to control the Plan's RKA costs.

10.    At all times during the Class Period, the Plan had at least six hundred million dollars in assets under management. At the Plan's fiscal year end in 2020, the Plan had $658,567,466 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2020 Form 5500 for the Plan, Schedule H, at 2.

11.    By 2024, the Plan had $792,013,098 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 2.

12.    The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 4,603 participants. *See* 2020 Form 5500 for the Plan, at 2. In 2024, the Plan had 4,410 participants. *See* 2024 Form 5500 for the Plan, at 2.

13.    With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a guaranteed investment contract ("GIC") in the Plan with lower crediting rates compared to available, similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

14.    Specifically, Defendants allowed substantial assets in the Plan to be invested in a guaranteed investment contract (the "Prudential GIF"), a general account contract, with Prudential Retirement Insurance & Annuity Company ("Prudential" or "PRIAC").[6] The Prudential GIF

---

[6] "On April 1, 2022, Empower Annuity Insurance Company of America (EAIC), an affiliate of Empower Retirement, LLC (Empower) acquired the retirement services business of Prudential Financial, Inc. (Prudential). EAIC acquired Prudential's retirement services businesses with both a share purchase and a reinsurance transaction. EAIC acquired the shares of Empower Annuity Insurance Company (formerly Prudential Retirement Insurance and Annuity Company), and business written by The Prudential Insurance Company of America was reinsured by EAIC and Empower Life & Annuity Insurance Company of America of New York (for New York business)." https://www.empower.com/prudential-participants-transition (last accessed on April 6, 2026).

provided a significantly lower rate of return than other comparable investments that Defendants could have made available to Plan participants.

15.   A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

16.   Prudential benefited significantly from Plan participants being invested in the Prudential GIF. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Prudential GIF was benefiting Prudential at the expense of the participants in the Plan. The investments in the Prudential GIF were held and invested by Prudential, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plan's participants). The crediting rates that Prudential provided to the Plan were and are so low that Prudential reaped a windfall on the spread.

17.   Plaintiffs also allege that the Defendants engaged in prohibited transactions with a party-in-interest. Specifically, Defendants breached their fiduciary duties of prudence by allowing a party-in-interest, Prudential,[7] to benefit from its provision of services to the Plan by receiving excessive compensation for managing the Prudential GIF.

18.   The arrangements and transactions with Prudential are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a

---

[7] "Certain Plan investments are managed by Empower Annuity Insurance Company (previously referred to as Prudential Retirement Insurance and Annuity Company) and Prudential Bank & Trust, F.S.B., the insurance company and the trustee of the Plan, and, therefore, the investment transactions qualify as party-in-interest transactions." Auditor's Report, attached to 2022 Form 5500 for the Plan, at 14.

party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

19.     Plaintiffs also allege that the Defendants engaged in prohibited transactions with Prudential, a party-in-interest, under which Prudential received millions of dollars in exchange for recordkeeping services and trustee services rendered to the Plan. Defendants' conduct was especially egregious given that Prudential received additional income from certain of the Plan's investment securities, described below.

20.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

21.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II) and violations of ERISA's prohibited transactions (Counts III and IV).

## II.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

23.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

24. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District, and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

25. Plaintiff, Veldina Cook ("Cook"), resides in Plainfield, New Jersey. During her employment, Plaintiff Cook participated in the Plan. Ms. Cook invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to underperformance of the Prudential GIF. In addition, Plaintiff Cook also suffered injury to her Plan account by paying excessive recordkeeping costs.

26. Plaintiff, Tory Tucker ("Tucker"), resides in Atlanta, Georgia. During his employment, Plaintiff Tucker participated in the Plan. Mr. Tucker invested in the Prudential GIF in the Plan and suffered injury to his Plan account due to underperformance of the Prudential GIF. In addition, Plaintiff Tucker also suffered injury to his Plan account by paying excessive recordkeeping costs.

27. Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

28.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

29.     QBE Holdings, Inc. is the Plan sponsor and a named fiduciary with a principal place of business at One QBE Way, Sun Prairie, Wisconsin. *See* 2024 Form 5500 of the Plan, at 1; *see also* QBE 401(k) Savings Plan Summary Plan Description, January 1, 2022 ("SPD"), at 13 ("The Plan Sponsor and Plan Administrator is QBE Holdings, Inc."). "QBE Holdings Inc. operates as a holding company. The Company, through its subsidiaries, provided boat, automobile, home, landlord, travel, health, farm, marine, property, and liability insurance services."[8]

30.     "The Retirement Investment Committee determines the appropriateness of the Plan's investment offerings, monitors investment performance, and reports to the Plan's Board of Directors." Auditor's Report attached to 2024 Form 5500 for the Plan, at 7.

31.     QBE, through its Board, appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

---

[8] *See* https://www.bloomberg.com/profile/company/2341482Z:AU. (last accessed April 6, 2026).

32. Accordingly, QBE during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

33. For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Board Defendants

34. The Company's Board of Directors appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

35. Accordingly, each member of the Board during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each had a duty to monitor the actions of the Committee.

36. The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

### Committee Defendants

37. The Committee is the Plan Administrator for the Plan. *See* Auditor's Report attached to 2024 Form 5500 for the Plan, at 7 ("The Retirement Investment Committee determines the appropriateness of the Plan's investment offerings, monitors investment performance, and reports to the Plan's Board of Directors.").

38.     "The Retirement Investment Committee determines the Plan's valuation policies utilizing information provided by the trustee, and insurance company." *Id*., at 9.

39.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

40.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

## IV.     CLASS ACTION ALLEGATIONS[9]

41.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[10]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the QBE 401(k) Savings Plan (f/k/a QBE The Americas 401(k) Savings Plan), at any time between April 10, 2020, through the date of judgment (the "Class Period").

42.     The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 4,410 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 for the Plan, at 2.

---

[9] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.*, 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[10] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

43.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

44.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are/were fiduciaries of the Plan;

B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.    Whether the Company and/or Board failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.    The proper form of equitable and injunctive relief; and

E.    The proper measure of monetary relief.

45.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

46. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

47. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V. THE PLAN

48. The Plan is a defined contribution plan covering substantially all eligible employees of QBE Holdings, Inc. *See* Auditor's Report, attached to 2024 Form 5500 for the Plan, at 7 ("The Plan is a defined contribution plan originally effective May 1, 1990. … The Plan is subject to the Employee Retirement Income Security Act of 1974 (ERISA)."); *see also id*. ("Employees of QBE Holdings, Inc. (the Company) are eligible to participate in the deferral, matching and nonelective contribution components of the Plan on their date of employment."); SPD, at 1 ("You are an 'Eligible Employee' if you are employed by QBE Holdings, Inc. or any affiliate who has adopted the Plan.").

49. Included in the Plan's available funds was a guaranteed investment contract offered by Prudential. *See* Auditor's Report, attached to 2020 Form 5500 for the Plan, at 11 ("The Plan

invests in the Prudential Retirement Insurance & Annuity Company Guaranteed Income Fund, which is backed by the general account of Prudential Retirement Insurance & Annuity Company (PRIAC). … The guaranteed investment contract issuer is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan.").

50.     At the end of 2020, $107,860,051 in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the Plan, at 13.

51.     At the end of 2024, over $114 million in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the Plan, at 15.

52.     The chart below demonstrates the amount of Plan assets invested in the Prudential GIF during the Class Period.

| Plan Year | Plan Assets in Prudential GIF | Total Amount of Plan Assets | Plan Assets in Prudential GIF as Percentage of Total Plan Assets |
| --- | --- | --- | --- |
| 2020 | $107,860,051 | $658,567,466 | 16.38% |
| 2021 | $110,790,252 | $754,240,989 | 14.69% |
| 2022 | $107,868,544 | $633,769,093 | 17.02% |
| 2023 | $107,244,297 | $730,533,258 | 14.68% |
| 2024 | $114,488,529 | $792,013,098 | 14.46% |

***Contributions***

53.     Eligible participants may contribute up to 75 percent of pretax annual compensation to the Plan. *See* SPD, at 2 ("You may elect to reduce your Compensation (defined below) and make a contribution to the Plan on a pre-tax basis. These pre-tax contributions are known as Elective Deferral Contributions. You may elect to defer up to 75% of your Plan Compensation on a pre-tax basis but must defer at least 1% of Plan Compensation.").

54.     Plan participants may also make after tax contributions to their Plan account. *See id.* ("You may also elect to make a contribution to the Plan on an after-tax basis.").

55.     The Company contributes 50 percent of the first 6 percent of a participant's employee contribution.  *See id.*, at 2-3 ("If you make a "Matched Employee Contribution" the Employer will contribute to your Employer Matching Contribution Account in an amount equal to 50% of the Matched Employee Contributions that are not in excess of 6% of your Plan Compensation."); *see also* QBE the Americas 401(k) Savings Plan ("Plan Doc."), at 19 ("The Employer will contribute as an Employer Matching Contribution an amount equal to i. 50% of the Participant's Matched Employee Contributions that are not in excess of ii. 6% of the Participant's Plan Compensation.").

56.     Like other companies that sponsor 401(k) plans for their employees, QBE enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally*, https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

57.     QBE also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See*, https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

58.     Given the size of the Plan, QBE likely enjoyed significant tax and cost savings from offering a match.

**VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO SELECT AND MONITOR THE PRUDENTIAL GIF IN A PRUDENT MANNER**

**A.    The Prudential GIF in the Plan**

59.    As indicated above, the Plan was invested in the Prudential GIF, a proprietary stable value fund managed by Prudential.[11]

60.    A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[12]

61.    Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[13]

62.    The Prudential GIF is thus a contract and not a mutual fund investment.  To be sure, there are important differences between a mutual fund and stable value fund.  Unlike mutual funds, stable value funds are defined by their predictability, they offer a set return on investment irrespective of management style, and their associated risk level is a creature of their structural design rather than their investment strategy.

---

[11] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[12] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[13] *Id*.

63.    There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Prudential GIF; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

64.    Here, the Prudential GIF "meets the fully benefit-responsive investment contract criteria and therefore is reported at contract value. Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan. Contract value, as reported to the Plan by Prudential Retirement Insurance and Annuity Company, represents contributions made under the contract, plus earnings, less participant withdrawals, and administrative expenses." Auditor's Report, attached to 2020 Form 5500 for the Plan, at 11.

65.     The Auditors' Report attached to the 2024 Form 5500 for the Plan states as follows:

> The Plan invests in the Empower Annuity Insurance Company Guaranteed Income Fund, which is backed by the general account of Empower Annuity Insurance Company (EAIC). ***EAIC maintains the contributions in a general account.*** The account is credited with earnings on the underlying investments and charged for participant withdrawals and administrative expenses. ***The guaranteed investment contract issuer is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan. The crediting rate is based on a formula established by the contract issuer but may not be less than 1.5%. The crediting rate is reviewed on a semi-annual basis for resetting.*** The investment objective of the Guaranteed Income Fund is to provide money market-like liquidity and safety of principal with an attractive rate of return.
>
> ***This contract meets the fully benefit-responsive investment contract criteria and therefore is reported at contract value.*** Contract value is the relevant measure for fully benefit-responsive investment contracts because this is the amount received by participants if they were to initiate permitted transactions under the terms of the Plan. Contract value, as reported to the Plan by Empower Annuity Insurance Company, represents contributions made under the contract, plus earnings, less participant withdrawals, and administrative expenses. Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at contract value.

16

> ***The Plan's ability to receive amounts due is dependent on the issuer's ability to meet its financial obligations.*** The issuer's ability to meet its contractual obligations may be affected by future economic and regulatory developments.
>
> Certain events might limit the ability of the Plan to transact at contract value with the issuer. Such events include (1) amendments to the Plan documents (including complete or partial Plan termination or merger with another plan), (2) changes to the Plan's prohibition on competing investment options or deletion of equity wash provisions, (3) bankruptcy of the Plan Sponsor or other Plan Sponsor events (for example, divestitures or spin-offs of a subsidiary) that cause a significant withdrawal from the Plan, (4) the failure of the trust to qualify for exemption from federal income taxes or any required prohibited transaction exemption under ERISA, or (5) premature termination of the contract. ***No events are probable of occurring that might limit the ability of the Plan to transact at contract value with the contract issuers and that also would limit the ability of the Plan to transact at contract value with the participants.***

Auditors' Report attached to the 2024 Form 5500 for the Plan, at 13 (emphasis added).

66.     Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment.

67.     For the above reasons, the Prudential GIF's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. The Prudential GIF's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Prudential GIF, therein making stated risk considerations equivalent.

68.     As discussed below, Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

17

**B.      Defendants Failed ERISA's High Standards Regarding Process and Methodology for Evaluating Investments**

69.      As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

70.      ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

71.      As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

72.      Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

73.      Reasonable prudent monitoring of stable value funds like GICs requires fiduciaries to evaluate the terms and conditions of the GIC contracts, research the relevant market, and test

18

the market by, among other things, issuing requests for information and proposals from competing GIC providers.

74.    In the case of stable value options, there is not one commonly accepted and publicly available index in which to compare GICs.

75.    The Plan only offers one stable value product. Participants wishing to invest in a stable value product in the Plan have no choice other than the Prudential GIF.

76.    Accordingly, the measurement of stable value funds, and specifically the Prudential GIF, against prudently managed alternative stable value funds is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

77.    Indeed, "peer comparison is one of the most widely used and accepted methods of equity analysis used by professional analysts, individual investors, and professionals."[14]

78.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

79.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

80.    It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

---

[14] *See* https://www,investopedia.com/terms/p/peer-group.asp (last visited Jan. 29, 2026).

81.    To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

82.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

83.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on December 15, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

84.    By letter dated January 14, 2026, the Plan's administrator responded to Plaintiffs' request. No meeting minutes or investment policy statements,[15] to the extent they exist, were

---

[15] Failure to provide Plan documents within thirty days of request is a violation of 29 U.S.C. § 1132(c)(1) and 29 U.S.C. § 1024(b)(4). Plaintiffs reserve the right to amend the instant Complaint to add a count for violation of the forgoing ERISA provisions.

produced in response to Plaintiffs' request. Nor was the investment management contract for the Prudential GIF provided.

85.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

86.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

87.    In particular, Defendants failed to (1) consider the undue riskiness of the Prudential GIF, and (2) failed to prudently monitor the Prudential GIF, by among other things, determining readily available alternative stable value funds to replace the imprudent Prudential GIF.

88.    Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prudential GIF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**C.      Defendants Failed to Consider the Undue Riskiness of the Prudential GIF**

89.      "When evaluating a traditional GIC, the most important consideration for the fiduciary . . . is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[16]

**1.      Prudential/Empower Pose A Severe Risk Of Becoming Insolvent**

**a.      The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable**

90.      Because a guaranteed insurance account product – like the Prudential GIF - is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer.  It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

91.      A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable.  It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723.

92.      The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A")

---

[16] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

carriers are: (1) Higher Risk, Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations. *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[17]

93.     These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

**b.     Based on its Insufficient Surplus, Prudential/Empower Was/Is at Severe Risk of Insolvency**

94.     Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

95.     An important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better.  The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios.  During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio.  For example, as of 2024, Empower's S/L ratio was less than 1%:

---

[17] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

**LIABILITIES, SURPLUS AND OTHER FUNDS**

| | | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | shares common (value included in Line 29 $ ) | | |
| 36.2 | shares preferred (value included in Line 30 $ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus:  $   1,018,399,778  EAIC's 2024 Surplus to Liabilities
Total Liabilities:  $ 106,414,669,390  Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**   0.96%   National Average is About **7.5%**.

96.     There are numerous L&A carriers that have substantially higher S/L ratios than Empower.  For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | 1 | 2 |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | shares common (value included in Line 29 $ ) | | |
| 36.2 | shares preferred (value included in Line 30 $ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus:  $   26,427,441,247  EAIC's 2024 Surplus to Liabilities
Total Liabilities:  $ 218,473,153,964  Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**   12.10%   National Average is About **7.5%**.

c.     **Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

97.     Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that $2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities

24

on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.



98.    Separate and in addition to the reserve credit reported above, Empower has also entered into a Modified Coinsurance (ModCo) reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:



99.    The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



100.    The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[18]

101.    Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[19]

---

[18]  *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity"  *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

[19]  "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by

meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 17.

### d. Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid Investment Concentrations

102.    Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

103.    The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



---

a variety of tactics, including restructuring transactions, financial engineering and geographic relocation    to    amenable    jurisdictions."    Investopedia,    found    at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp

104.    Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

*        *        *

105.    In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

**D.    The Prudential GIF Materially Underperformed Relative to Comparator Stable Value Fund GICs**

106.    As noted above, selecting and monitoring stable value products requires researching the relevant market, and testing the market by, among other things, issuing requests for proposals to solicit bid proposals. That is because stable value products are substantially similar in that their stated goal is to preserve income.

107.    Accordingly, it is a best practice for plans with substantial participant investments in stable value products to solicit competitive bids to initially select a stable value product, monitor opportunities in the marketplace on an ongoing basis, and periodically solicit competitive bids.

108.    The Plan's fiduciaries took no such steps. Had Defendants continually monitored and evaluated the Prudential GIF's rates, they would have known, if they did not actually know, that the investment underperformed year after year for the entire Class Period compared to other comparable stable value funds.

109.     If Defendants had adopted and implemented a prudent process or policy, they could easily have selected or switched to another stable value fund with a proven track record of competitive returns.

28

110.    The terms of the Prudential GIF allow for this action. The Prudential GIF provides a guaranteed interest rate that is guaranteed for a six-month period before it is reviewed for resetting.[20] So at a minimum, every six months leading up to and during the Class Period, Defendants had an opportunity to rectify their imprudent conduct and select another GIC with higher crediting rates. Moreover, the terms of the Prudential GIF contract allowed Plan participants to withdraw their investments at full value[21] to invest elsewhere, like in a prudent GIC alternative, if that choice had been made available to them by the Plan's fiduciaries.

111.    As stated above, the Prudential GIF's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. Additionally, the Prudential GIF's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Prudential GIF, therein making risk considerations equivalent.

112.    The Comparator GICs below meet these requirements. Importantly, the Prudential GIF had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

---

[20] *See* Auditor's Reports, attached to 2024 Form 5500 for the Plan, at 13 ("The crediting rate is reviewed on a semi-annual basis for resetting.").

[21] *See id*. ("Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at contract value.").

113.    Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 1.    There are Many GICs in the Marketplace with Competitive Crediting Rates

114.    The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

115.    Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

116.    The Comparator GICs (defined below) were offered in other defined contribution plans, like the Plan, and bore no characteristics that would make them ineligible for inclusion in the Plan.  Thus, the Comparator GICs were clearly available to be selected by the Plan's fiduciaries.

117.    As representative examples, these comparisons include:

- Auto-Owners Life Insurance Company ("AOLIC") provided a "fully benefit-responsive investment contract" for the Auto-Owners Insurance Company Retirement Savings Plan. Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the Prudential GIF, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id*., at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*.

- The Ameritas 401(k) Retirement Plan offered a "fully benefit-responsive" unallocated insurance contract with Ameritas Life Insurance Corp. Auditor's Report attached to the 2024 Form 5500 for the Ameritas 401(k) Retirement Plan, at 10. "Interest rate guarantees of the unallocated insurance contract are backed by assets held by the Company." *Id*. Like the Prudential GIF, "[u]nder no event may the Company terminate this contract and settle at an amount different from contract value." *Id*.

- The Standard 401(k) Plan offered "a fully benefit-responsive investment contract ("FBRIC") with Standard [Insurance Company]." Auditor's Report attached to 2024 Form 5500 for The Standard 401(k) Plan. "The Plan's ability to receive amounts due is dependent on the issuer's ability to meet its financial obligations." *Id*. Like the Prudential GIF, "The FBRIC does not permit the insurance company to terminate the agreements prior to the scheduled maturity date" and "[n]o events are probable of occurring that might limit the Plan's ability to transact at contract value with the contract issuer and that also would limit the ability of the Plan to transact at contract value with the participants. *Id*.

- The Ford Foundation Retirement Plan offered "a guaranteed fixed annuity contract" that was "fully and unconditionally guaranteed by TIAA." Auditor's Report, attached to 2024 Form 5500 for the Ford Foundation Retirement Plan, at 11. "The participant's principal, plus a specified minimum rate of interest, are guaranteed by TIAA's claims-paying ability." *Id*., at 12.

- The Transamerica 401(k) Retirement Savings Plan offered "a fully benefit-responsive GIC with TFLIC, where TFLIC maintains the contributions in a general account." Auditor's Report, attached to 2024 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at 8. "The GIC issuer contractually must repay the principal and a specified interest rate that the issuer guarantees to the Plan." *Id*. Like the Prudential GIF, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id*., at 9.

118. Collectively, the GICs in the Auto-Owners Insurance Company Retirement Savings Plan, the Ameritas 401(k) Retirement Plan, The Standard 401(k) Plan, the Ford Foundation Retirement Plan, and the Transamerica 401(k) Retirement Savings Plan are referred to as the "Comparator GICs."

119. The Prudential GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans.

120. The Prudential GIF's consistent underperformance was detrimental to Plan participants. Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance.

31

This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

### a. The Prudential GIF performed poorly when compared to the Comparator GICs at the Start of the Class Period

121.    In 2020, the Comparator GICs performed much better than the Prudential GIF. Specifically, the Comparator Funds had an average calculated crediting rate of 3.42%. The calculated crediting rate for the Prudential GIF was 1.83% in 2020.

122.    The table below demonstrates the underperformance of the Prudential GIF compared to the Comparator Funds.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[22] |
|------|-----------|---------------------|-------------|-------------------|--------------------|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Life Insurance | 3.48% |
| | The Standard 401(k) Plan | 4,554 | $920,504,787 | Standard Insurance | 3.23% |
| | Ford Foundation Retirement Plan | 228 | $292,861,235 | TIAA-CREF | 4.04% |
| | Transamerica 401(k) Retirement Savings Plan | 14,722 | $2,347,162,318 | Transamerica Financial Life | 3.27% |
| | **QBE Plan** | **4,603** | **$658,567,466** | **Prudential** | **1.83%** |

---

[22] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

123.   In 2020, Prudential GIF underperformed the Comparator GICs by 46.46%.

124.   Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2020, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **QBE Plan** | **4,603** | **$658,567,466** | **Prudential** | **1.83%** |

**b.   The Prudential GIF's Poor Performance Continued through 2021**

125.   As demonstrated in the table below, the Prudential GIF's poor performance continued through 2021.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |

| | Ameritas 401(k) Retirement Plan | 3,537 | $779,870,323 | Ameritas Life Insurance | 3.43% |
|---|---|---|---|---|---|
| | The Standard 401(k) Plan | 4,674 | $1,062,535,266 | Standard Insurance | 3.29% |
| | Ford Foundation Retirement Plan | 198 | $309,155,677 | TIAA-CREF | 3.56% |
| | Transamerica 401(k) Retirement Savings Plan | 14,065 | $2,563,127,214 | Transamerica Financial Life | 3.32% |
| | **QBE Plan** | **4,562** | **$754,240,989** | **Prudential** | **1.70%** |

126.    In 2021, the Prudential GIF underperformed the Comparator GICs by 48.86%.

127.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2021, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |

| | | | | |
|---|---|---|---|---|
| Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| **QBE Plan** | **4,562** | **$754,240,989** | **Prudential** | **1.70%** |

c.    **The Comparator GICs Outperformed the Prudential GIF in 2022**

128.    As demonstrated in the table below, the Prudential GIF's poor performance continued through 2022.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |
| | Ameritas 401(k) Retirement Plan | 3,779 | $636,210,578 | Ameritas Life Insurance | 3.30% |
| | The Standard 401(k) Plan | 4,832 | $931,024,946 | Standard Insurance | 3.22% |
| | Ford Foundation Retirement Plan | 174 | $261,575,612 | TIAA-CREF | 4.21% |
| | Transamerica 401(k) Retirement Savings Plan | 14,280 | $2,116,061,137 | Transamerica Financial Life | 3.23% |
| | **QBE Plan** | **4,571** | **$633,769,093** | **Prudential** | **1.68%** |

129.    In 2022, the Prudential GIF underperformed the Comparator GICs by 50.70%.

130.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2022, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Allina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| | **QBE Plan** | **4,571** | **$633,769,093** | **Prudential** | **1.68%** |

> **d.     The Prudential GIF's Poor Performance Continued through 2023**

131.    As demonstrated in the table below, the Prudential GIF's poor performance continued through 2023.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | Ameritas 401(k) Retirement Plan | 3,686 | $741,588,807 | Ameritas Life Insurance | 3.66% |
| | The Standard 401(k) Plan | 5,371 | $1,129,069,194 | Standard Insurance | 3.64% |
| | Ford Foundation Retirement Plan | 126 | $287,214,199 | TIAA-CREF | 4.76% |
| | Transamerica 401(k) Retirement Savings Plan | 14,168 | $2,425,600,114 | Transamerica Financial Life | 3.79% |
| | **QBE Plan** | **4,594** | **$730,533,258** | **Prudential** | **1.93%** |

132.    In 2023, the Prudential GIF underperformed the Comparator GICs by 50.08%.

133.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as Prudential GIF in 2023, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |

| | | | | |
|---|---|---|---|---|
| Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| **QBE Plan** | **4,594** | **$730,533,258** | **Prudential** | **1.93%** |

**e.    The Comparator GICs Outperformed the Prudential GIF in 2024**

134.    In 2024, the Comparator GICs outperformed the Prudential GIF.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | Ameritas 401(k) Retirement Plan | 3,632 | $821,792,248 | Ameritas Life Insurance | 3.91% |
| | The Standard 401(k) Plan | 5,845 | $1,332,816,995 | Standard Insurance | 4.01% |
| | Ford Foundation Retirement Plan | 90 | $298,370,091 | TIAA-CREF | 4.59% |
| | Transamerica 401(k) Retirement Savings Plan | 13,910 | $2,720,479,704 | Transamerica Financial Life | 3.86% |
| | **QBE Plan** | **4,410** | **$792,013,098** | **Empower** | **2.04%** |

135.    In 2024, the Prudential GIF underperformed the Comparator GICs by 48.41%.

136.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2024, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Lexmark Savings Plan | 2,926 | $1,211,057,397 | American General Life Insurance Company | 3.38% |
| | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
| | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
| | Boyd Company 401(k) Plan | 1,762 | $204,430,246 | Standard Insurance Company | 3.21% |
| | **QBE Plan** | **4,410** | **$792,013,098** | **Empower** | **2.04%** |

137. Throughout the Class Period, the Prudential GIF underperformed the Comparator Funds by an average of almost 49%, as demonstrated in the table below.

| Year | Prudential GIF Rate of Return in the Plan | Comparator GIC Average Rate of Return | Prudential GIF Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2020 | 1.83% | 3.42% | 46.46% |
| 2021 | 1.70% | 3.32% | 48.86% |
| 2022 | 1.68% | 3.41% | 50.70% |
| 2023 | 1.93% | 3.87% | 50.08% |
| 2024 | 2.04% | 3.95% | 48.41% |
| Average Underperformance during Class Period | | | 48.90% |

138. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Prudential GIF's dismal crediting rate.

139.    Again, the specific Comparator GICs used herein had similar risk considerations based on its terms and the creditworthiness of its insurance carriers. The Comparator GICs were fully benefit-responsive.

140.    In short, because the Plan held over $600 million in assets under management throughout the Class Period, it had considerable leverage to bargain for higher crediting rates.

141.    A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates and/or by submitting requests for proposals to Prudential and other providers of stable value investments.

142.    There is one more noteworthy benchmark to consider. According to an article by the Stable Value Institute of America ("SVIA"), "[t[he Stable Value Investment Association recently examined 135,000 retirement savings plans serving approximately 42 million participants. From January 2010 through December 2019, stable value assets in [retirement] plans grew at a compound annual rate of 4.1%."[23]

143.    Here, from 2020 to 2024 the Comparator GICs had an average return of 3.59%. Thus, the average returns for the Comparator GICs for this time period is a relatively conservative return compared to the 4.1% returns observed by the SVIA. Yet, even while conservative, the Comparator GIC's average returns were higher than the Prudential GIF's average returns.

144.    The Prudential GIF had an average return of 1.84% from 2020 to 2024.  This was over 55% less than the 4.1% returns the SVIA cited for 42 million participants.

---

[23] *See* "Retirement Plans and Stable Value: By  the Numbers," updated July 21, 2025, available at https://www.stablevalue.org/retirement-plans-and-stable-value-by-the-numbers/ (last visited March 9, 2026)

145.    Thus, by selecting the Prudential GIF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

146.    With the significant amount of assets under management in the Prudential GIF, the losses suffered by Plan participants were devastating, costing the Plan and its participants millions of dollars. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[24]

147.    In sum, the Prudential GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

148.    Given the Plan's substantial stable value investment assets, reasonably prudent monitoring of the Prudential GIF required Defendants to evaluate the terms and conditions of the GIC contract, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing stable value providers.  All of which they failed to do.

---

[24] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed April 10, 2026).

**VII.    DEFENDANTS COMMITTED A PROHIBITED TRANSACTION RESULTING IN EXCESSIVE RKA COSTS FOR THE PLAN AND ITS PARTICIPANTS**

149.    During the Class Period, Defendants entered into a contract with Prudential to provide, among other things, RKA services. However, such engagements and subsequent services provided by Prudential constitute prohibited transactions under ERISA.

150.    29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

151.    Here, Prudential was a party in interest to the Plan as it was receiving compensation for RKA services, as well as compensation from trustee services from the Plan. Prudential was also a party in interest as it was receiving compensation for managing/maintaining the Plan's investments in Prudential's funds.

**A.    Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants**

152.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

153.    There are two essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

B. Multi-channel participant and plan sponsor access (e.g. phone, web);

C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D. Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (e.g., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G. Plan-level reporting and annual financial package (excluding IRS Form 5500);

H. Participant education (e.g. newsletters, web articles, standard communication materials);

I. Plan consulting (e.g., preapproved document services, operational materials);

J. Plan consulting (e.g. preapproved document services, operational compliance support).

154. This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

155.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

       a.     Loan processing;

       b.     Brokerage services/account maintenance (if offered by the plan);

       c.     Distribution services; and

       d.     Processing of qualified domestic relations orders.

156.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

157.    In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper ***notwithstanding the level, number and character of the services provided to that additional participant***.

158. Recordkeepers such as Prudential, among others, invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.*, website, call center, and some print services).

159. Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

**B.      The Plan's Recordkeeping Fees to Prudential were Excessive**

160. As demonstrated in the tables below, the Plan's participants were saddled with above-market administrative and recordkeeping fees during the Class Period.

161. The Plan's per participant RKA fees were as follows:

| Plan Year | Recordkeeper | Participants | Total RKA Reported | PP$ |
|---|---|---|---|---|
| 2020 | Prudential | 4,603 | $303,649 | $65.97 |
| 2021 | Prudential | 4,562 | $291,515 | $63.90 |
| 2022 | Prudential | 4,571 | $234,920 | $51.39 |
| 2023 | Prudential | 4,594 | $218,003 | $47.45 |
| 2024 | Empower | 4,410 | $195,495 | $44.33 |

162. Looking at recordkeeping costs for plans similar in size to the assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than its peers.

| Plan Year | Plan Name | Recordkeeper | Assets Under Management | Participants | Schedule C Codes | Cost Per Participant[25] |
|---|---|---|---|---|---|---|
| 2020 | Johnson Brothers 401(k) Plan | Wells Fargo | $236,760,533 | 3,655 | 15 21 37 50 62 64 | $49 |
| 2020 | Refinitiv 401(k) Savings Plan | Voya | $1,013,607,858 | 3,795 | 37 64 | $38 |
| 2020 | Evoqua Water Technologies LLC Savings Plan | Schwab | $507,272,363 | 3,940 | 15 50 64 | $54 |

---

[25] Unless otherwise noted, these fees are taken from the Form 5500s.

| | | | | | | |
|---|---|---|---|---|---|---|
| 2020 | Morningstar, Inc. 401(k) Plan | Schwab | $681,973,580 | 3,950 | 15 50 64 | $47 |
| 2020 | Ceridian Savings and Investment Plan | T.Rowe Price | $591,489,462 | 3,200 | 15 21 25 28 37 38 49 50 52 59 62 64 65 99 | $48 |
| 2020 | Optumcare Management, LLC 401(k) Retirement Savings Plan | Fidelity | $938,281,291 | 9,832 | 37 60 64 65 71 | $19 |
| **2020** | **QBE Plan** | **Prudential** | **$658,567,466** | **4,603** | **13 15 37 50 64 65** | **$66** |
| | | | | | | |
| 2021 | Meriter 401(k) Plan | Fidelity | $300,507,455 | 4,155 | 37 60 64 65 | $45 |
| 2021 | Hallmark Affiliates Employee Savings Plan | Great-West | $459,563,415 | 3,286 | 15 37 50 64 | $51 |
| 2021 | Enloe Medical Center Defined Contribution Retirement Plan | Fidelity | $219,896,932 | 3,677 | 60 64 65 | $43 |
| 2021 | Protective Life Corporation 401(k) Plan | Fidelity | $602,700,167 | 4,026 | 37 60 64 65 | $58 |
| 2021 | Evoqua Water Technologies LLC Savings Plan | Schwab | $558,545,953 | 4,000 | 15 50 64 | $56 |
| 2021 | Crowe LLP Retirement Plan | Vanguard | $1,021,351,197 | 6,840 | 15 33 37 99 | $27 |
| **2021** | **QBE Plan** | **Prudential** | **$754,240,989** | **4,562** | **13 15 37 50 64 65** | **$64** |
| | | | | | | |
| 2022 | Hilti Retirement Savings Plan | Prudential | $523,145,772 | 4,424 | 12 13 15 27 37 50 64 | $29 |
| 2022 | Crowe LLP Retirement Plan | Vanguard | $992,984,046 | 7,584 | 15 33 37 99 | $26 |
| 2022 | Vista Outdoor Inc. 401(k) Plan | Vanguard | $440,444,788 | 7,295 | 15 16 33 37 38 99 | $33 |
| **2022** | **QBE Plan** | **Prudential** | **$633,769,093** | **4,571** | **13 15 37 50 64 65** | **$51** |
| | | | | | | |
| 2023 | Marelli North America, Inc. 401(k) Retirement Plan | Fidelity | $203,248,425 | 3,043 | 37 60 64 65 71 | $39 |
| 2023 | Crowe LLP Retirement Plan | Vanguard | $992,984,046 | 7,992 | 15 33 37 99 | $26 |
| **2023** | **QBE Plan** | **Prudential** | **$730,533,258** | **4,594** | **13 15 37 50 64 65** | **$47** |

| 2024 | Maplebear Inc. d/b/a Instacart Retirement Plan | Fidelity | $297,040,898 | 3,473 | 37 60 64 65 71 | $31 |
|---|---|---|---|---|---|---|
| 2024 | Steel Partners 401(k) Savings Plan | Fidelity | $287,412,653 | 3,074 | 37 60 64 65 | $35 |
| 2024 | Bose Employees' Retirement Savings 401(k) Plan | Empower | $680,910,797 | 3,848 | 15 37 50 64 | $29 |
| 2024 | Crowe LLP Retirement Plan | Vanguard | $1,265,316,102 | 7,934 | 15 33 37 99 | $21 |
| **2024** | **QBE Plan** | **Empower** | **$792,013,098** | **4,410** | **13 15 37 50 64 65** | **$44** |

163.    The above table demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees during the Class Period.

164.    The Plan's $54 average per participant fee from 2020 to 2024 is thirty percent (30%) above the average fee of $38 per participant from 2020 to 2024 for the twenty-one (21) plans listed above.

165.    This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2020 through 2024. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees during the Class Period.

166.    The Plan should have been able to obtain per participant recordkeeping fees of no more than $38 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

167.    Because Prudential was a party-in-interest, the Plan's fiduciaries should have taken the additional sources of income paid to Prudential into consideration to reduce the excessive RKA fees paid to Prudential.

168.    For the foregoing reasons, Defendants' violation of ERISA's prohibited transactions resulted in Plan participants paying excessive RKA fees to Prudential.

47

## COUNT I
## Breaches of Fiduciary Duty of Prudence
## (against the Committee)

169.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

170.    At all relevant times, the Committee, and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

171.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

172.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Prudential GIF based solely on the merits of the investment and what was in the best interest of Plan's participants. Instead, the Prudence Defendants selected and retained the Prudential GIF in the Plan despite poor performance in relation to other comparable investments.

173.    As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prudential GIF, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary

48

obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

174.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties and must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

175.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company and the Board)**

176.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

177.    QBE, and its Board, (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee. Monitoring Defendants were aware that the Committee had critical responsibilities as fiduciaries of the Plan.

178.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

179.    The Monitoring Defendants also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on

49

which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company and the Board.

180. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

181. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

182. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT III**
**Prohibited Transaction With Respect to the Prudential GIF**
**(against all Defendants)**

183. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

184. Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

185. Defendants were at all times fiduciaries to the Plan.

186.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

187.    Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and Prudential.

188.    Defendants also caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Prudential and the Plan.

189.    When Defendants caused the Plan to engage in the annuity transaction, Prudential was a party in interest because, *inter alia*, Prudential, or its affiliate, was a person providing recordkeeping and trustee services to the Plan. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plan to engage in the annuity transaction.

190.    These transactions occurred each time the Plan paid fees to Prudential in connection with the Plan's investments in the Prudential GIF and other proprietary options that paid revenue sharing to Prudential.

191.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## COUNT IV
### Prohibited Transaction With Respect to RKA
### (against all Defendants)

192.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

193.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

194.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

195.    ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

196.    Defendants' decision to agree to pay excessive fees to Prudential as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

197.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits that the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: April 10, 2026                          Respectfully submitted,

                                               /s/ Mark K Gyandoh
                                               Mark K. Gyandoh, Esquire
                                               PA Attorney ID #88587
                                               James A. Maro, Esquire
                                               PA Attorney ID #86420
                                               **CAPOZZI ADLER, P.C.**
                                               312 Old Lancaster Road
                                               Merion Station, PA 19066
                                               Tel.: (610) 890-0200
                                               Email: markg@capozziadler.com
                                                       jamesm@capozziadler.com

                                               *Counsel for Plaintiffs and the Putative Class*

54